[No. 30278. Department Two. June 17, 1948.]

HARRY R. PORTER *et al., Respondents,* v. FRANK J. BRICE
*et al., Appellants.*[1]

*Schaefer & Hall,* for appellants.

*Bates & Burnett,* for respondents.

JEFFERS, J.—In this action, we are presented with questions relative to the affairs of a partnership composed of Harry R. Porter, E. M. Wiley, and Frank J. Brice. The action was instituted by Harry R. Porter and E. M. Wiley

[1]Reported in 194 P. (2d) 958.

against Frank J. Brice and wife and Pearl Stewart, on or about August 10, 1946. Plaintiffs asked that the partnership be dissolved; that an accounting be had; that a receiver be appointed to liquidate the partnership assets and wind up its affairs; that certain real estate described in the complaint as lots 11 and 12, in block 10, of Munday's Addition to the city of Vancouver, and fractional lots 3 and 4, block 1, of Munday's Second Addition to the city of Vancouver, Washington, which real estate now stands in the name of Frank J. Brice and Fay E. Brice, his wife, subject to the rights of Pearl Stewart, as vendee under a conditional sale contract, be decreed to be an asset of the partnership; that Frank J. Brice and wife be enjoined from collecting from defendant Pearl Stewart any further payments on account of such contract; and that Pearl Stewart be enjoined from making any further payments under the contract until this action is heard and determined. Defendant Pearl Stewart filed no pleading.

Defendants Brice and wife, by their answer, admitted that a partnership was formed in 1942, for the purpose of acquiring real property, constructing houses thereon, and selling same; that the partnership agreement was oral, and that each of the parties agreed to contribute in equal shares, money, time, effort, and labor essential to the accomplishment of the purposes for which the partnership was formed, to contribute equally to make good any losses which might occur, and to share equally in the profits.

Defendants admitted that the real property above described (hereinafter referred to as the Ivaleotes property) was acquired by the partnership from Tom Ivaleotes and wife on October 27, 1943, but denied that title to partnership real estate was, from time to time, taken in the name of the individual partner, as alleged in paragraph No. 4 of the complaint, and denied that on or about March 28, 1944, at the request of defendant Frank Brice, and in accordance with such custom, his name was inserted as grantee in the deed to the Ivaleotes property; admitted that Frank Brice and wife, without the knowledge or consent of plaintiffs, made and entered into an executory contract of sale, by the

terms of which they agreed to sell the Ivaleotes property to Pearl Stewart for four thousand dollars, and that three thousand dollars of the purchase price remains unpaid.

Defendants admitted that, as stated in the complaint, they claim as their property the real estate hereinbefore described, and that plaintiffs have no interest therein. Defendants further admitted that they have refused to account to plaintiffs for the moneys they have received from defendant Pearl Stewart.

By way of an affirmative defense, defendants alleged in substance that the partnership continued until about March, 1944, at which time, by mutual consent and agreement orally made, the partnership was dissolved; that it was agreed between the parties that defendants Brice and wife were to receive, as their part of the settlement of the partnership assets, the Ivaleotes property; that plaintiff Porter directed the execution of the Ivaleotes deed to defendants Brice and wife, in full and complete settlement of their share of the partnership assets; that defendants Brice and wife accepted the property as their share of such assets; and that plaintiffs are now estopped from asserting that a dissolution and settlement did not take place. By way of a further affirmative defense, defendants pleaded the statute of limitations.

Plaintiffs, by their reply, denied the allegations contained in the answer not admitted by the complaint.

The cause came on for trial before the court on January 28, 1947.

The record in this case presents a rather unusual state of affairs. While the partnership was formed for the purposes above stated, and while it is admitted that the partners were to contribute in equal shares, money, time, effort, and labor, it appears without dispute that Mr. Wiley never contributed any money to the enterprise, that Mr. Brice contributed only one hundred dollars in money, which he admits was repaid to him, and that Mr. Porter furnished all the money which was required to purchase the property acquired by the partnership from the time it was formed up to the time in 1944 when Mr. Brice contends the partner-

ship was dissolved. It appears without contradiction that Mr. Porter borrowed from the bank on his own responsibility the money necessary to carry on the partnership; that, in the construction of buildings on the partnership property, the work was largely done by Brice and Wiley, who were carpenters, and that they were paid for all this work at the going wages. All of the business was handled by Mr. Porter, who had been in the real-estate business in Vancouver for many years. These three men had known each other for many years. Mr. Brice apparently kept a time book on the workers' time, and Porter kept the books and records pertaining to the partnership affairs.

A considerable amount of property was purchased by the partnership, houses were erected thereon and sold, and it may be admitted that no accounting was made by Mr. Porter to the other members of the partnership, nor was any asked for, until about March, 1944, at which time Brice stated he asked for an accounting. In so far as the record shows, there had been no trouble between the partners up until that time. According to Mr. Brice, at that time he informed Mr. Porter he "was dissatisfied with the partnership business and the way the business was conducted," and wanted to get out of it, and Mr. Porter promised to get the books audited. About a week later, he again talked to Mr. Porter and made the proposition to Porter that he would take the Ivaleotes property as his share of the company assets. Porter informed him that he could not accept that proposition, and Brice then said, "All right, get the books audited," which according to Brice, Porter agreed to do. About a week later, Brice again discussed the matter with Porter, in the latter's office, and

" . . . he [Porter] walked up and leaned over the counter and he said, 'Frank, I will take you up on that, if you still want it.' I said to him, the Ivaleotes deal and he said yes and he took the deed out, put it in the typewriter, put my and my wife's name on it and put the revenue stamps, gave me the deed, the abstract, the keys."

The above conversation was supposed to have occurred on Saturday. Mr. Brice stated that, on the following Mon-

day, he told Mr. Wiley about the deal. "Q. What did Mr. Wiley say? A. He said, 'I guess I can't do a thing about it.'"

Mr. Porter stated that the Ivaleotes deed did not contain the name of any grantee when it was first executed, and that he had possession of the deed.

"Q. Was the deed afterward delivered to Mr. Brice? A. Yes, I inserted his name and his wife and handed it over to him. Q. About when did that occur? A. Oh, it was along in February, as I remember it, 1944. . . . Q. Did you consult with Mr. Wiley before the delivery of this deed to Mr. Brice? A. No, I did not. Q. Did Mr. Wiley know that you had delivered the deed to Brice? A. Not at the time. . . . Q. Why did you deliver the deed to Brice? A. Because he made so much fuss about closing the deal, the contract and the partnership, that I thought that might satisfy him for a time, to hold the deed. Q. Do you know what he did with the property afterwards? A. Yes, he filed the deed after I had told him not to and sold the property. Q. To whom? A. To Stewart, that is a part of it anyway. . . . Q. At the time you delivered this deed to Mr. Brice was there any accounting made of the partnership affairs at that time? A. No, there was not. Q. Did you know at that time how much any partner's share of the profits were at that particular time? A. Not exactly, no. Q. Did you later prepare a statement of the partnership transactions? A. I did. Q. And about when did you do that? A. I think in March, 1944 [admitted to be 1946]. . . . Q. Did you deliver copies to Mr. Brice and Mr. Wiley? A. I did. Q. Did you have a meeting in your office with respect to the report that you had made? A. Yes, sir. Q. And they were both present, were they? A. Yes, sir. Q. That report, I believe—what did that indicate as respective shares of these partners? A. That the respective shares was $1750.00 or thereabouts. . . . Q. Well, did Mr. Brice and Mr. Wiley express any dissatisfaction with this statement that you had prepared? A. They looked it over and wanted to know about certain things and I immediately furnished the information that they wanted regarding it. Q. Well, were they satisfied with the explanation you made? . . . Q. Well, what did they say, Mr. Porter? A. Well, after looking over the statement, the last page shows the division, and Mr. Brice said that he didn't have any money, that all he could do in the way of settlement was to turn over the contract. Q. What contract? A. The

contract of the Stewart's, and he would do that the next morning, Saturday morning. He had it up home. But the next morning he didn't come with it, and that was Saturday morning. Monday morning I called him on the 'phone and asked him what he was—that he hadn't brought the contract in yet and he said that he didn't know that he would, that he had rather changed his mind about that. . . . Q. Now, at that time—strike that. In 1944 when the deed was delivered to Mr. Brice, had the partnership any other assets, at that time, of any substantial value? A. No."

The statement or report made out by Mr. Porter was introduced as plaintiffs' exhibit No. 1.

On cross-examination, Mr. Porter stated that at no time did Mr. Brice ever tell him that he wanted to withdraw from the partnership.

"Q. As far as you know, then, he is still in the partnership, as far as he had said anything to you? A. Yes, sir."

Mr. Porter emphatically denied that, at the time he gave the deed to Brice, the latter stated he was withdrawing from the partnership and emphatically denied that he, Porter, agreed to give Brice the deed as his share in the partnership assets. It is admitted that the partnership was dormant after March, 1944; that no more property was bought or sold.

It is apparent that the testimony of Mr. Porter and and Mr. Brice is in direct conflict as to what transpired at the time the Ivaleotes deed was delivered to Mr. Brice, and as to the reason for making the delivery. There is testimony that one other piece of partnership property had been taken in the name of Mr. Brice, and that some of the partnership property had been taken in the name of Mr. Porter.

Mr. Wiley does not seem to know much about the transactions. While he appeared as plaintiff in the case, at the time of trial he expressed a desire to withdraw, apparently for the reason that he was not sure whether he was entitled to something from Mr. Porter or Mr. Brice. This doubt in his mind seems to have been created after a talk with Mr. Brice in the office of counsel for Brice, but never-

theless Wiley stated that he thought there should be an accounting, in order that a determination could be made of just how much, if anything, was coming to the respective partners, and he stated that he thought he was entitled to something from either Porter or Brice.

It may be stated here that there is absolutely nothing in the record to indicate that Mr. Porter has acted other than with the utmost fairness towards the other members of the partnership, or that he has not at all times acted in furtherance of the partnership business.

At the close of the case, the court, in an extensive statement, summed up the situation, and we are of the opinion that the conclusion reached by the court and the reasons therefor are sound and fully supported by the facts and the law applicable thereto. This being an equity case, no findings of fact were required; however, the judgment does in fact contain findings. We quote the material part of the order entered February 7, 1947:

"That the partnership heretofore existing and composed of Harry R. Porter, Frank J. Brice and E. M. Wiley, be and the same is hereby terminated and dissolved; that an accounting be had of all partnership assets and property of every kind and that an auditor be appointed to prepare and file herein a statement of all partnership assets and liabilities and each of said partners is directed to make available to said auditor all books of account, papers, writings, documents and records of every kind which bear upon or relate to the business transactions of the partnership aforesaid; that the following described real property in Clark county, Washington:

Lots eleven (11) and twelve (12) in block ten (10) of Munday's Addition to the City of Vancouver, and fractional lots three (3) and four (4) of block one (1) of Munday's Second Addition to the city of Vancouver, Washington

is hereby found and declared to have been an asset of said partnership, subject however, to the terms and provisions of a certain executory contract of sale dated March 29, 1944, which is of record in the office of the county auditor for Clark county, Washington, in volume 402 at page 77, upon which the balance of principal unpaid is the sum of $3,000.00, is a valid and subsisting contract for the pur-

chase of the lands herein described; that until otherwise ordered all installments of principal and interest accrued on said contract since the commencement of this action and payments hereafter accruing thereon be paid into the registry of this court, the ultimate disposition thereof to be determined by the accounting hereinbefore ordered;

"That upon the filing of the auditor's report, each of the parties hereto may within 15 days thereafter serve and file exceptions thereto, and jurisdiction of the cause is retained to hear and settle said report and the exceptions thereto, if any, to make and enter such order as may be necessary to effect a complete accounting of the partnership affairs, and to enter a final decree thereon. The allowance of costs is deferred until the entry of a final decree herein."

Mr. and Mrs. Brice have appealed from the above order, contending that the court erred in refusing to decree and find that the partnership was terminated and dissolved in or about March, 1944; in not finding and decreeing that the Ivaleotes property was given to appellants as their share of the partnership property in full and complete settlement; and in refusing to decree that respondents are estopped to claim the Ivaleotes property as partnership assets.

We are of the opinion the order entered by the trial court is supported by the facts in this case and the law applicable thereto.

We adopt as our reasons for concluding that the order entered by the trial court must be affirmed, the reasons and conclusions of the trial court contained in its statement made at the close of the trial. The court quoted from 40 Am. Jur. 365, § 335, as follows:

" 'A right of action between partners for an accounting and settlement after the dissolution of the firm is barred after the expiration of the statutory period from the time when the cause of action accrues. . . . It is, however, well settled that the statute does not in any event begin to run until after the dissolution of the partnership.' "

It is evident that the statute of limitations would have no application in this case, unless there had been a dissolution of the partnership. The statute was not raised by Mr. Wiley, and Mr. Brice contends that he was let out of the partnership at the time Mr. Porter gave him the deed.

■ We are convinced, as was the trial court, that there never was a dissolution of the partnership. We are also convinced that Mr. Porter did not give Mr. Brice the deed to the Ivaleotes property with the intention or understanding that Mr. Brice was to take such deed as and for his interest in the partnership assets, but, to the contrary, we are of the opinion the deed was given and received with the understanding that Mr. Brice was to hold it for the partnership until an accounting could be had. We quote from the statement of the trial court relative to the testimony of Mr. Porter and Mr. Brice occurring at the time the deed was given to Mr. Brice, and relative to Mr. Wiley's position in this case:

"Now, the testimony is in direct conflict there so it is pretty hard to say what occurred as a fact, but I am impelled to the conclusion that there was no sufficient meeting of the minds there to make it constitute a contract of settlement between the parties. If Mr. Brice thought he was being settled with, I think, at least, that Mr. Porter had reservations about it, and certainly Mr. Wiley was not consulted at the time. That, I think, is rather an important factor, that there were three partners here and not two, and in order to constitute a settlement with any one, all three had to agree to it. Mr. Wiley's attitude is pretty hard to interpret. At the time he was informed that Mr. Brice was going to ask for this, he says, and then he was informed later that Mr. Brice had got the deed and that he had settled with Mr. Porter, and he said as to that that he didn't protest because he had to be satisfied with it. There wasn't anything he could do. Well, of course, there was something he could do, but then he didn't know that. Anyway, that was his attitude. He just did nothing. He thought he couldn't do anything. And then after this attempt at an accounting in March, 1946, he went with Mr. Porter to Mr. Burnett's office and talked about the case, took the position that he wanted an accounting and settlement and joined as party plaintiff there, let the case run on until after an answer had been received from Mr. Brice, consulted in regard to that and then finally decided that he didn't want to press this against Mr. Brice. His first answer to Mr. Burnett's question, there, as to why he had withdrawn or attempted to withdraw was that he thought perhaps he had gotten after the wrong man. That is the im-

plication of his answer, that he thought maybe instead of getting something back from Mr. Brice that he would get his settlement from Mr. Porter, that there must have been thirteen thousand or so to divide if Mr. Porter would give Mr. Brice that property in settlement of his part, and that therefore he would withdraw. I think he was somewhat doubtful all the time as to who should account to him. Well, he is still in the case and, as he says, he still desires an accounting, and I don't think it ought to be held against him that he isn't able to decide just now whether Mr. Brice has got too much or whether Mr. Porter has paid too little. That is something he couldn't decide without an accounting. Anyway, he wants an accounting, and if he wants to take the position that he himself wouldn't require Mr. Brice to pay him any part of this proceeds of this property, why, that is his own affair, but still he wants an accounting. And I don't see that his coming in here now, after he is on the witness stand and saying that he doesn't desire to take the position of requiring Mr. Brice to account is of very much weight because he was a plaintiff and is yet a plaintiff, and, even now, on the witness stand, says he wants an accounting. . . .

"Well, I am now also impelled to that view by the improbability of such a settlement. Why would Mr. Porter give Mr. Brice absolutely and irrevocably property that was admitted to be worth $4,500 under those circumstances when it is clear that he said at the time he didn't know how matters stood among the partners. And it is clear also that developments since, even though the collateral did not go bad and paid out its face, still leave in his hands very little assets of any great consequence.

"Now, Mr. Schaefer urges the view that Mr. Porter thought at the time that the profits were large and that he wasn't, therefore, giving Mr. Brice too much. I can hardly believe that because no business man who has any experience at all in accounting, with a ledger account of the partnership there before him, and it was kept apparently, as far as the testimony goes. There was a ledger account kept with the partnership. . . .

"In order to find dissolution, we must find that it was agreed at the time of the transaction by the three partners. That is absolutely necessary because it is apparent that an agreement made between the two of them and ratified by the third would be valid also, but the third is pretty doubtful as to whether he ever ratified it or not. He seemed to take the position that he didn't think he could do anything

and he has never ratified it unless he ratified it here on the stand today, and that comes pretty late for the other parties.

"I don't see how we can reach the conclusion that justice would be done to all these parties by sustaining a doubtful settlement under the circumstances and it would be a much nearer just settlement to have an accounting of the affairs of all of the partners and have a settlement on the basis of that accounting, just as they all agreed in the beginning. I think that ought to be done. I don't know what is the best way to do it. Perhaps you gentlemen could confer about that and make suggestions to the court. We could refer it to some auditor if you wanted, to get up the account, then any legal questions there are remaining could be thrashed out in subsequent hearing."

Mr. Tempes, counsel for defendant Pearl Stewart, then interposed the following question:

"What is the status of the Stewart contract with Mr. Brice? THE COURT: The Stewart contract isn't involved in any way. A partner has a full right to make a sale of property of the partnership when the current business was dealing in property."

While Mr. Tempes represented Pearl Stewart at the trial, no formal pleadings were filed in her behalf.

We are of the opinion the evidence fully justifies the conclusion reached by the trial court and the order appealed from. We therefore conclude that the order of February 7, 1947, should be, and it is, affirmed.

MALLERY, C. J., BEALS, STEINERT, and ROBINSON, JJ., concur.